COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Felton, Judges Elder and Kelsey
Argued at Chesapeake, Virginia


JOSHUA LAMONT FRANKLIN

MEMORANDUM OPINION[*] BY
v.      Record No. 2243-06-1          CHIEF JUDGE WALTER S. FELTON, JR.
APRIL 15, 2008
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Stephen C. Mahan, Judge

Suzanne G. Moushegian, Senior Assistant Public Defender (Office
of the Public Defender, on brief), for appellant.

Benjamin H. Katz, Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


Joshua Lamont Franklin (appellant) was convicted following a jury trial of first-degree

murder in violation of Code § 18.2-32, and use of a firearm in the commission of murder in

violation of Code § 18.2-53.1.[1]  Appellant contends the trial court erred in failing to suppress

statements he gave to police on January 4, 2005, after being read Miranda warnings.  We conclude

that the trial court did not err in denying appellant's pretrial motion to suppress those statements,

which the record shows were made voluntarily, knowingly, and intelligently.  Accordingly, we

affirm his convictions.

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] An earlier trial on these offenses ended with a mistrial when the jury was unable to
reach a verdict.

## I. BACKGROUND

"On appeal from a denial of a suppression motion, we examine the evidence in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." Barkley v. Commonwealth, 39 Va. App. 682, 687, 576 S.E.2d 234, 236 (2003). "'In so doing, we must discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" Washington v. Commonwealth, 43 Va. App. 291, 300, 597 S.E.2d 256, 260 (2004) (quoting Watkins v. Commonwealth, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998)).

So viewed, the evidence established that Detective Gonda of the Virginia Beach Police Department was assigned to investigate the death of Ian Scarborough resulting from gunshot wounds. In the course of his investigation, Detective Gonda developed appellant as a suspect in Scarborough's murder.

On January 4, 2005, Detective Gonda asked appellant if he would voluntarily speak with him at the police station. Appellant agreed to do so.[2] He arranged his own transportation to the police station, arriving at approximately 1:15 p.m. that day. Once there, appellant was given a polygraph test. Afterwards, he was taken to an interrogation room where he was informed that he had failed the test. He was then questioned for approximately five hours by Detectives Gonda and Coerse. The videotape of the detectives shows that appellant was alert and responsive to the questions he was asked. After initially aggressively questioning appellant, telling him they believed he killed Scarborough, calling him a punk and a liar, the detectives moved to a less aggressive strategy, developed a rapport with appellant, and suggested they thought the shooting may have been an accident. Appellant stated several times that he wanted to talk to them, but

---

[2] Detective Gonda communicated with appellant once in person and once by telephone before asking him to come to the police station for an interview.

also told them that he wanted to spend one last night with his family before he provided any information to the police. Throughout the questioning, Detective Gonda repeatedly advised appellant he was free to leave. When encouraging appellant to talk, Detectives Gonda and Coerse made no promises of leniency. Detective Gonda explained to appellant that he could tell the magistrate that he did not consider appellant a flight risk, but that the magistrate would make the ultimate decision regarding appellant's bond. He also advised appellant that the Commonwealth's Attorney would make the ultimate decision as to the charges to be brought against him.

Around 7:00 p.m., before appellant was given <u>Miranda</u> warnings, Detective Gonda asked him, "[w]as this an accident?[,]" to which appellant responded, "[y]es." Detective Gonda then asked, "[a]re you sorry that you killed [Scarborough]. Are you sorry, Josh?" Appellant again responded, "[y]es." When appellant said that he "only went out there to scare [Scarborough]," Detective Gonda stopped the interrogation, offered appellant a drink, and left the interrogation room for approximately eight minutes.

When Detective Gonda returned, he read appellant the <u>Miranda</u> warnings.[3] Appellant never stated that he understood or waived the <u>Miranda</u> warnings given to him. He told Detective Gonda that he shot Scarborough, and provided a detailed account of events leading up to and following the shooting. He insisted that he didn't intend for any of the shots he fired to hit Scarborough.

Before trial, appellant moved to exclude all statements made to Detectives Gonda and Coerse. Appellant's motion sought to exclude

> all evidence, written, oral, and physical, *including any statements made by [] [appellant] . . . whether prior or subsequent to his arrest . . .* [and] that the Court order any statement or evidence improperly obtained be excluded from any trial of charges brought

---

[3] Appellant, age twenty, had a ninth grade education and was able to read and write.

against [] [appellant] as a result of the seizure of such evidence and, further, that such improperly obtained evidence not be used for any investigative purpose, including obtaining derivative evidence . . . .

(Emphasis added). At the suppression hearing, however, appellant asked the trial court to suppress only the statements made after he was given the <u>Miranda</u> warnings.[4] The trial court heard Detective Gonda's testimony. It reviewed the videotape of him giving the <u>Miranda</u> warnings to appellant, and appellant's subsequent statements to him. Based on what it heard and saw, it denied appellant's motion to suppress any statements made *after* he received the <u>Miranda</u> warnings. After reviewing all the evidence presented, the jury convicted appellant of the first-degree murder of Scarborough and use of a firearm in the commission of that murder.

## II. ANALYSIS

### A. Appellant's Statements Before and After Receiving Miranda Warnings

Appellant's only argument to the trial court at the suppression hearing was that the statements he made after he received the <u>Miranda</u> warnings should have been suppressed. Appellant now contends, for the first time on appeal, that he was in police custody as soon as he arrived at the police station and that all statements he made to the detectives, both pre-<u>Miranda</u> warnings and post-<u>Miranda</u> warnings, should be suppressed. Because appellant failed to argue at the suppression hearing that his statements made before he received the <u>Miranda</u> warnings should be suppressed, we only consider whether appellant voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights after receiving the <u>Miranda</u> warnings. <u>Commonwealth v. Hilliard</u>, 270 Va. 42, 53, 613 S.E.2d 579, 586 (2006) (holding that a claim arguably encompassed in a general, broadly worded motion to suppress, but not specifically articulated in the motion or

---

[4] Appellant argued, "[t]he detectives at a minimum should have just asked, Do you understand those rights? Without that, Judge, what you've got here before you, it doesn't even rise to an acquiescence to a waiver. So I would ask the court to suppress any of the inculpatory statements he made after [the <u>Miranda</u> warnings]."

- 4 -

mentioned in oral argument on the motion is not preserved for appeal), aff'g 43 Va. App. 659, 676-77, 601 S.E.2d 652, 660-661 (2004) (*en banc*). Moreover, had appellant argued at the suppression hearing that he was in custody prior to receiving the Miranda warnings and that those statements made prior to the warnings were not admissible, the Commonwealth would have had the opportunity to appeal any adverse ruling pursuant to Code § 19.2-398. See Upchurch v. Commonwealth, 31 Va. App. 48, 53, 521 S.E.2d 290, 292 (1999) ("The Commonwealth's right to appeal is an essential component in the process of correcting misapplications of the law . . . .  The justification for the requirement of a pretrial suppression motion is readily apparent in light of the Commonwealth's limited right to appeal an adverse suppression ruling.").

B.  Voluntary, Knowing, and Intelligent Waiver of Miranda Warnings

Appellant also argues that his statements should have been suppressed because he did not make a voluntary, knowing, and intelligent waiver of his Miranda rights before he made statements to Detectives Gonda and Coerse.  We conclude from the record on appeal that appellant voluntarily, knowingly, and intelligently waived his Miranda rights.

> [T]he inquiry whether a waiver of Miranda rights was made knowingly and intelligently is a question of fact and the trial court's resolution of that question is entitled to a presumption of correctness . . . .  "The court's determination [of whether a person knowingly and intelligently waives his Miranda rights] is a question of fact based upon the totality of the circumstances.  This factual inquiry will not be disturbed on appeal unless plainly wrong."  Watkins v. Commonwealth, 229 Va. 469, 477, 331 S.E.2d 422, 429-30 (1985).

Harrison v. Commonwealth, 244 Va. 576, 581, 423 S.E.2d 160, 163 (1992) (internal citation omitted).

Here, Detectives Gonda and Coerse questioned appellant for some time before Detective Gonda asked, "[w]as this an accident? . . . [a]re you sorry that you killed [Scarborough]?  Are

you sorry, Josh?" to which appellant responded "[y]es." When appellant began to explain that he "only went out there to scare him," Detective Gonda stopped the interrogation, and stated, "hey Josh before we get into that let me do this okay, let me make you a photocopy of this, and I'll bring it back, and I will bring you back in a drink."[5] He told appellant he would be back in a few minutes and offered him a drink. Approximately eight minutes later, and before Detective Gonda resumed the interrogation, he told appellant

> This is what I'm gonna do. Okay. I want to get you to your folks'
> house, so you can see them. Okay. All right. *I want to find out
> exactly what you're gonna tell me for real.* All right. Before I do
> that[,] I'm gonna read you your rights. I'm gonna start setting
> things up, okay, to talk with your folks.

(Emphasis added). The videotape, made part of the record, shows that Detective Gonda read the Miranda warnings to appellant from an index card that contained all of the warnings required by Miranda.[6] While the record reveals that Detective Gonda never specifically asked appellant if he understood his Miranda rights, "Miranda does not require a waiver to be in writing or verbalized expressly." Id. at 582, 423 S.E.2d at 163.

> "The question is not one of form, but rather whether the defendant
> in fact knowingly and voluntarily waived the rights delineated in
> the Miranda case. As was unequivocally said in Miranda, mere
> silence is not enough. That does not mean that the defendant's
> silence, coupled with an understanding of his rights and course of
> conduct indicating waiver, may never support a conclusion that a
> defendant has waived his rights. The courts must presume that a
> defendant did not waive his rights; the prosecution's burden is
> great; but in at least some cases waiver can be clearly inferred from
> the actions and words of the person interrogated."

---

[5] Detective Gonda's statement refers to a photocopy of a note Detective Coerse wrote promising appellant that he would be allowed to visit his parents and that Detective Gonda would tell the magistrate he found appellant to be remorseful and did not consider him to be a flight risk.

[6] See Barkley, 39 Va. App. at 694, 576 S.E.2d at 240 (Merely "giving the[] [Miranda] warnings does not necessarily place the individual 'in custody' at the level of restraint associated with formal arrest." (citing Davis v. Allsbrooks, 778 F.2d 168, 172 (4th Cir. 1985))).

Id. (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979)).  As soon as Detective Gonda

finished reading the Miranda warnings to appellant, he said,

> There's a few things I need to do, and then I'll come back in here.
> Do you want to swallow [the water appellant was drinking] so I
> can bring you some more?  No, okay.  Do you need to use the
> bathroom at all?  You do?  Is that a yes?

Appellant then left the interrogation room to go to the bathroom.  When he returned, he provided

a detailed explanation of his shooting Scarborough.

Here, the record supports the trial court's factual findings that appellant understood the

Miranda rights read to him and that he made a voluntary, knowing, and intelligent decision to

waive those rights.  The record further shows that several times during the interview, prior to his

being given the Miranda warnings, appellant stated that he wanted to talk to the detectives about

the shooting, but did not want to talk at that time because he wanted to spend one last night with

his family.  Detective Gonda confirmed to appellant that if he told them he killed Scarborough,

he would probably not be allowed to spend the night at home.  Detective Gonda nevertheless

encouraged appellant to talk, telling him that cooperating with the police was one way he could

show the magistrate and Commonwealth's Attorney that he was remorseful for what happened.

Detective Gonda also explained that, regardless of what appellant told him, he would take

appellant home to "talk with [his] folks" before taking him to the magistrate.[7]  When appellant

initially admitted he shot Scarborough, Detective Gonda stopped him from making any further

statements until after he had been advised of his Miranda rights.  It is clear from Detective

Gonda's warnings that appellant understood that once he provided details of the shooting, his

freedom would be restricted to a "'degree associated with formal arrest,'" and he would not be

---

[7] Following appellant's arrest, Detective Gonda took appellant home to visit his family before taking him to the magistrate.  Detective Gonda also told the magistrate he did not consider appellant a flight risk and recommended the magistrate consider a personal recognizance bond for him.

permitted to spend one last night with his family.  <u>Aldridge v. Commonwealth</u>, 44 Va. App. 618, 642, 606 S.E.2d 539, 551 (2004) (quoting <u>Harris v. Commonwealth</u>, 27 Va. App. 554, 564, 500 S.E.2d 257, 262 (1998)).  Nevertheless, appellant readily answered Detective Gonda's questions and did not invoke his <u>Miranda</u> rights.  Viewing the totality of the circumstances, we cannot conclude the trial court's factual findings that appellant voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights, and understood the consequences of waiving those rights, were plainly wrong at the time he described the details of the shooting to Detectives Gonda and Coerse.

## III.  CONCLUSION

From our review of the record, we conclude that the trial court did not err in finding the Commonwealth satisfied its burden in proving the statements appellant made, after being given the <u>Miranda</u> warnings, were freely and voluntarily given and that appellant knew and understood the consequences of waiving his <u>Miranda</u> rights.  Therefore, we conclude that the trial court did not err in denying appellant's motion to suppress the inculpatory statements he made after receiving the <u>Miranda</u> warnings and admitting those statements at trial.  Accordingly, we affirm appellant's convictions.

<u>Affirmed.</u>